UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM L. MOORE, JR., | : | Case No. 1:13-cv-660 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| AMPAC, | : | |
| Defendant. | : | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(Doc. 19)**

This civil action is before the Court on Defendant's motion for summary judgment (Doc. 19) and the parties' responsive memoranda (Docs. 23, 25).[1]

## I.  BACKGROUND FACTS

Plaintiff began working for Defendant Ampac as a National Security Sales Representative in 2003.  Plaintiff was terminated just before his 61st birthday for alleged poor performance.  Plaintiff alleges causes of action for age discrimination under the Age Discrimination in Employment Act ("ADEA") and under Ohio Revised Code Chapter 4112.  Defendant maintains that Plaintiff cannot overcome its legitimate business reasons for termination.

---

[1] Plaintiff requests oral argument.  (Doc. 23 at 1).  The Court finds that the pleadings are clear on their face, and that oral argument is not necessary.  *See Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 26, 2006) (C.J. Dlott) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

## II. UNDISPUTED FACTS[2]

1. Moore, a sixty-two year old salesman, began his employment with Ampac in 2003 after his former employer, Innovation Packaging, was acquired by Ampac. (Doc. 14 at 9, 27-28).

2. Ampac was aware that Moore was uniquely suited to serve as a salesman in the security field given that he had both an MBA in finance and a certification in treasury professionalism. (Doc. 14 at 74).

3. Ampac attempted to hire him in 2002 while he was still employed by Innovation Packaging. (Doc. 14 at 74).

4. Moore served as a national security sales representative tasked with selling Ampac's security division products. (Doc. 14 at 13).

5. As a national security sales representative Moore targeted national retailers and banks. (Doc. 14 at 13).

6. In 2009 Moore requsted that Ampac pay security division employees a commission stemming from a performance bonus program started a year and a half earlier ("Commission Payment"). (Doc. 14 at 155).

7. Tom Geyer, President of Ampac's retail and security divisions, was not happy that he had to pay the $40,000 bonus, but Moore produced the paperwork proving that the bonus was owed. (Doc. 14 at 51; Doc. 15 at 9).

8. Sales in Ampac's security sales division declined significantly in 2010 due to the loss of several major accounts including, but not limited to, Bank of America and Control Paper. (Doc. 14 at 56).[3]

9. The loss of these accounts resulted in a net loss of fifteen percent of the security sales division's total revenue, or five million dollars. (*Id.*)[4]

---

[2] *See* Doc. 19 and Doc. 23, Ex. 3.

[3] Plaintiff claims that despite these loses, his sales were continuing to grow. (Doc. 14 at 54-56).

[4] Plaintiff notes that these were low margin accounts and the sales force was tasked with trying to replace their profitability. (Doc. 14 at 56-59).

10. Ampac brought in a new Global Vice President of Security Sales, Sep Italiano to stem the loss of business and increase division sales. (Doc. 18 at 58; Doc. 14 at 48-49).

11. Moore began reporting directly to Italiano upon his arrival in early 2010 and it became clear that the security sales force would be required to be more aggressive and sell a higher volume of product to make up for the losses. (Doc. 18 at 8; Doc. 14 at 57).

12. On August 3, 2010, Moore was placed on a ninety day performance plan ("Plan 1"). (Doc. 18 at 16, Ex. 1).

13. According to Plan 1, as of July 31, 2010 Moore had visited twelve potential new clients and generated thirty-five thousand dollars of new business per month. (Doc. 18, Ex. 1).[5]

14. Moore was placed on a ninety day performance improvement plan and required to meet fifteen new clients a month and generate eighty-one thousand dollars of new business per month. (Doc. 18, Ex. 1).

15. Plan 1 stated that Moore needed to satisfy the new sales objectives for three months or was subject to termination. (Doc. 18, Ex. 1).

16. In a response to Plan 1, Moore highlighted that he was the eldest sales person in the division and had a proven track record with the Company. (Doc. 14 at 64, Ex. 2).

17. Moore's next performance issue was recorded on April 11, 2011. (Doc. 18 at 19; Doc. 14 at 86-87).

18. On August 11, 2011 Moore was issued a document entitled RE:2012 Sales compensation plan. (Doc. 18 at 20, Ex. 4).

19. Ann Marie Braker, Ampac's Director of Central Services, and Italiano met with Moore to discuss the August 11 document. (Doc. 17 at 64).

---

[5] Plaintiff testified that he had "no clue" how Ampac came up with these numbers based on the documentation available to the company at that time. (Doc. 14 at 69-70).

20. Italiano testified that the Company hoped to "kick start" Moore's ability to generate new business, inasmuch as small accounts did not require a national manager's attention and actually acted as a distraction from acquiring new business. (Doc. 18 at 21).

21. Plan 2 outlined new sales goals. Moore was expected to spend fifty percent of his time developing new accounts and acquire a minimum of two new accounts monthly. (Doc. 14, Ex. 4).

22. Moore's performance would be reviewed every thirty days. (Doc. 14, Ex. 4).

23. Italiano explained why Moore and Trass were subject to Plan 2's requirements as opposed to other salespersons in the division:

    A. These goals were given to Bill Moore and Greg Trass.

    Q. And why was that?

    A. Because they were the only two that were in the plan of working with customers and retail customers. The sales reps were focusing on other areas where it would take a lot longer to close, and the other reps were brand-new reps, under the 18 months. So our expectation of that is new business.

    Q. I'm sorry, you went a little too fast for me, if you can speak up just a bit. Can you explain that again why?

    A. Bill Moore and Greg Trass were expected to hit these targets because they were the two sales reps, national sales reps that were focused on retail in this business. Other reps were either new reps under 18 months service. And one other rep, which was I believe at this time Steve Bansbach, was concentrating on banking. Focusing on banking is a totally different process than the area Greg and Bill were working in.

    (Doc. 18 at 23-24).[6]

24. Moore failed to open two new accounts each month. In fact, in the ninety Days following Plan 2's issuance, Moore failed to open two new accounts in two of the three months. (Doc. 18, Ex. 5).

---

[6] Plaintiff admits that Italiano testified to these facts, but denies the self-serving inference that goals for closing business could not have been applied to other sales representatives.

25. Moore was issued a first written warning ("Warning 1") on November 28, 2011, by Italiano and Braker. (Doc. 18 at 54-55; Doc. 14 at 134-135, Ex. 5).

26. Moore was not terminated immediately following the issuance of this letter. (Doc. 14 at 138, Ex. 5).

27. In late 2011, Trass was working to close an account with Unisource. (Doc. 16 at 15; Doc. 17 at 105).

28. Trass did not receive any additional warnings related to Plan 2. (Doc. 16 at 15-16).

29. Braker and Italiano issued Moore a 60-day performance plan dated February 24, 2012. (Doc. 18 at 59, Ex. 6).

30. Plan 3 states that Moore only hit his sales goals once in the previous six months. (Doc. 18, Ex. 6).

31. Moore was terminated by Italiano and Braker on May 4, 2012. (Doc. 18 at 22-23, 66; Doc. 14 at 141; Doc. 17 at 60).

32. Following his termination from Ampac, Moore worked several jobs before acquiring employment at PAC Worldwide ("PAC") in April, 2014. (Doc. 14 at 12).

33. Plaintiff filed a charge alleging age discrimination with the Equal Employment Opportunity Commission on October 15, 2012. (Doc. 1 at ¶ 7).

34. After the Commission dismissed the charge on June 25, 2013, Plaintiff filed suit. (Doc. 1 at ¶ 8).

35. Plaintiff brought causes of action against Defendant for age discrimination under the Age Discrimination in Employment Act ("ADEA") and Ohio Revised Code § 4112. (Doc. 1 at ¶¶ 21-32).

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

### IV. ANALYSIS

Plaintiff alleges that Defendant discriminated against him in violation of the ADEA and Ohio Revised Code Section 4112. (Doc. 1 at ¶¶ 21-32). Ohio's anti-discrimination statute closely parallels the federal statute, and when analyzing a claim pursuant to Ohio Revised Code Section 4112.14, Ohio courts rely on cases interpreting both Title VII and the ADEA for guidance. *Whitt v. Lockheed Martin Utility Serv., Inc.*, 209 F.Supp.2d 787, 792 (S.D. Ohio 2002).

The ADEA prohibits an employer from failing to hire, discharging or discriminating against an individual with respect to his or her compensation or terms, conditions, or privileges of employment because of his age. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (citing 29 U.S.C. § 623(a)(1)). A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence. *Id.* Direct evidence is evidence which, if believed, would require the conclusion that unlawful discrimination was at least a motivating factor. If a plaintiff does not have direct evidence of age discrimination, the age discrimination claim is analyzed using the *McDonnell Douglas* burden-shifting framework. *Id.* The ultimate question in any age discrimination claim under the ADEA is whether age was a determining factor in the adverse employment action. *Pastura v. CVS Caremark*, Case No. 1:11cv400, 2012 U.S. Dist. LEXIS 182991, at *7-8 (S.D. Ohio Dec. 31, 2012).

The first step of the *McDonnell Douglas* burden-shifting framework is that the plaintiff must establish a *prima facie* case of discrimination. In order to make a *prima facie* case, the plaintiff must establish the following elements: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002).[7] In the case of age discrimination, the "protected

---

[7] One option for the fourth element of a *prima facie* case of age discrimination is to show that the plaintiff was replaced by a substantially younger person. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521-22 (6th Cir. 2008). The other option for the fourth element is to show that the plaintiff was treated differently than similarly-situated, non-protected employees. *Id.*

7

group" is persons over the age of 40.

If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to identify a legitimate, non-discriminatory reason for the adverse employment decision. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). If the employer meets this burden of production, then the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate, non-discriminatory reason given is a pretext for discrimination. *Id.* Nevertheless, the overall burden of persuasion remains with the plaintiff at all times. *Id.*

### A. *Prima facie* case

It is undisputed that Plaintiff was over the age of forty (he was 60 years old) when he was terminated on May 4, 2012. (Doc. 14 at 9, 139). It is also undisputed that Plaintiff was qualified for his position, having served as a national security sales representative for both Innovative Packaging and Ampac. (*Id.* at 27-28, 33, 73-75). Accordingly, the Court will only address the fourth prong of the *prima facie* test, whether Plaintiff has established circumstances that support an inference of discrimination.[8]

Plaintiff can establish circumstances that support an inference of discrimination by presenting evidence that: (1) a similarly-situated non-protected employee was treated more favorably; or (2) he was replaced by someone outside the protected class. *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). To be similarly situated, plaintiff

---

[8] Plaintiff failed to offer any direct evidence of age discrimination, so he must produce circumstantial evidence of discrimination to survive summary judgment.

8

and the employees with whom he seeks to compare himself must be similar in "all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Within the disciplinary context, the comparable employees "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jackson v. Int'l Fiber Corp.*, 395 F. App'x 275, 280 (6th Cir. 2010).

### *1. Similarly situated employees*

Plaintiff argues that he was treated less favorably than younger sales representatives within the security sales division (Greg Trass, Brian Calabro, Tacy Swords, Sean Ryan, and Tom Lecy), inasmuch as they were not subjected to the same sales requirements or disciplined for conduct relating to the same. (Doc. 14 at 245-240).

With regards to Calabro, Swords, and Ryan, Plaintiff argues that the exclusion of these employees from the 2012 compensation plan is indicative of age discrimination. Defendant security sales representatives were supervised by Italiano as Vice President of Global Security. (Doc. 18 at 8-12). Italiano explained that these younger sales representatives were not subject to the 2012 compensation plan because they were new employees with less than 18 months of sales experience. (Dos. 18 at 23-24). Therefore, these are not proper comparators.

9

### a. Trass

Italiano, the decision maker who placed Plaintiff on the 2010 compensation plan, explained that Plaintiff was placed on the plan and Trass was not, because Trass was making the cold calls requested of him and Plaintiff was not. (Doc. 18 at 68-69). Plaintiff was placed on the 2010 plan for failing to contact the vast majority of the 84 sales leads Ampac supplied him – it had nothing to do with sales numbers, but rather sales activities – *i.e.*, the number of customer contacts made by Plaintiff. (*Id.* at 69). Trass met his quota. (*Id.*) The fact that Plaintiff was not interested in making sales calls or engaging in conduct that would result in new business is further supported by Ampac's Director of Human Resources, Randy Adams:

> A. …then one time [Moore] stood at my office door and he said, well, I had another meeting with [Braker] and [Italiano]. I said okay. And he said it didn't go well. I said, Bill what are they asking you to do? And he said, they're asking me to – and I'm not 100 sure he said this but it was in the context of – asking me to make more cold phone calls, I guess to customers, follow up on leads more, go out and sell a new book of business, that type of thing. He gave some answers like that. I looked at him and said, so why don't you just do that? And he looked at me and he says, nah, I would rather just let them fire me. At that point I just ended the discussion --.

(Doc. 24 at 15).

Therefore, Plaintiff and Trass cannot be compared relative to the 2010 performance plan, because Trass made his sales calls and Plaintiff did not. This fact creates a differentiating and mitigating circumstance distinguishing the two salesmen. *Johnson v. Gwen Mooney Funeral Home, Inc.*, No. C-1-09-254, 2010 U.S. Dist. LEXIS

76476, at *18 (S.D. Ohio July 29, 2010) ("To be similarly situated in a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for that conduct.").

Plaintiff also argues that when Ampac issued the 2012 Sales compensation plan to both he and Trass, the plan was not applied to them equally. It is undisputed that neither Plaintiff nor Trass (nor any other Ampac sales representative) satisfied the stated requirement to close two new accounts per month with annual sales potential in excess of $25,000. (Doc. 17, Ex. 4). However, Trass was never disciplined or subject to any form of corrective action for failing to meet those requirements on an on-going basis. (Doc. 18 at 54-55, 67-68). Plaintiff was disciplined twice for failing to close two new accounts per month as required and eventually was terminated for failing to meet these goals. (Doc. 14, Exs. 4-5; Doc. 18 at 34-36, 43).

Pursuant to the Plan, both employees were required to meet with Braker and Italiano in 30 day increments to review their performance. (Doc. 14 at 115).[9] Plaintiff claims that if the 2012 compensation plan had been applied equally, Trass would have been written up on November 28, 2011 for failing to comply with the provisions of the Plan. However, Plaintiff's analysis is based on the false premise that Trass brought in $1,000,000.00 of increased revenue in 2012:

---

[9] It is important to note that Trass was a substantially younger employee.

11

> Q. So Greg [Trass], you believe, brought in a million dollars or plus of increased revenue in 2012?
>
> A. Yeah. But I was only there four months. So I don't know. I am guessing that he did.

(Doc. 14 at 117).

However, Italiano testified:

> A. He [Trass] must have closed that [UniSource] in 2012, as it's not shown on this report. But the commitment between when a customer gives us a contract and when it shows on this report could be up to six months, because they're running out their stocks and their previous incumbent's numbers.

(Doc. 18 at 38-39).

Italiano further clarifies the chronology of events in his affidavit, stating that Trass negotiated the sales agreement with UniSource in September 2011. (Doc. 25, Ex. A at ¶ 2). Italiano further confirms that consistent with the sales agreement, UniSource submitted a purchase order to Ampac on December 9, 2011 for $284,000.00 worth of products. (*Id.* at ¶ 3). Therefore, Ampac was aware that Trass secured the UniSource business prior to November 28, 2011, the date Plaintiff was issued his first formal written warning in accordance with the 2012 compensation plan. (*Id.* at ¶ 4). Moreover, Plaintiff actually testified that he and Trass were treated similarly under the 2012 compensation plan:

> A. But I was told, in talking to Greg [Trass], that he had the same goals of $25,000 per new account, two accounts per year. And he had to meet with Ann Marie and Sep, just like I did.

(Doc. 14 at 115).

12

Plaintiff also argues that Trass did not technically meet the standards for the 2012 compensation plan, because he did not open two accounts worth more than $25,000 per month. However, the evidence makes clear that Ampac was not really concerned with the number of accounts opened each month, but rather it was interested in generating new business. (Doc. 14 at 126-127). Trass testified:

> Q. So it is your understanding that you didn't necessarily meet the goals that had been laid out for you, being the two accounts at 25,000 a month, two new accounts, but that, because there was this big account that came in, you didn't have to meet that two accounts at 25,000 per month, because you had that big account that came in; is that your understanding as to what happened?
>
> A. Roughly, I would say yes.

(Doc. 16 at 15-16).

Unlike Plaintiff, Trass acquired between $760,000 and $1,000,000 in new business following the initiation on the 2012 compensation plan. (Doc. 14 at 115; Doc. 18 at 41). Trass therefore significantly outpaced the plan's requirements and was successful at generating new business. With the UniSource account, Trass effectively secured the equivalent of 30 new $25,000 customers. In contrast, in the eight plus months that Plaintiff was on the plan, he only met his two $25,000 client goal once. This fact supports a finding that Plaintiff was unsuccessful in generating new business.[10]

---

[10] Ampac does not dispute that at the time of the 2012 compensation plan, Plaintiff's yearly revenue was passively increasing, but year to year increases are not evidence that Plaintiff engaged in activities likely to generate new business.

13

Therefore, Plaintiff and Trass cannot be compared, because there are differentiating circumstances, namely at least $760,000 in new business.

### b. Tracy Swords

Next, Plaintiff alleges that Swords was treated more favorably than him for two reasons: (1) she was not placed on the 2012 sales compensation plan; and (2) she was provided assistance in closing new business in the form of an incentive program for members of the retail division who provided her sales leads.

First, Plaintiff and Trass were subjected to the 2012 compensation plan because they were the most experienced sales persons and all other employees had worked in the division less than eighteen months. (Doc. 18 at 23-24). Plaintiff argues that Italiano testified that once a sales representative had 12-18 months of experience, he or she was expected to achieve the same levels of sales and close the same number of accounts as any other member of the sales. Therefore, Plaintiff alleges that Swords should have been subjected to the 2012 compensation plan, because she had been employed by Ampac for more than 12 months. However, Plaintiff mischaracterizes Italiano's testimony. Italiano testified:

> Q. After 12 to 18 months is your expectation that somebody would be able to close accounts at the same rate as somebody who'd been employed 10, 20, 30 years?
>
> A. Yes and no, because somebody that's been employed a long time should have made a lot of connections by then. But generally speaking, if we set a goal, then, yes, by 18 months they should know what they're doing.

(Doc. 18 at 11).

Italiano did not testify that sales persons with 12 to 18 months experience should be able to meet the same goals as a senior salesmen. This is further supported by the fact that less experienced sales representatives were not subject to the 2012 compensation plan, because they had less than 18 months of experience. (*Id.* at 23-24). Moreover, Swords had only been employed four months at the time the 2012 compensation plan was implemented. At the time of Plaintiff's termination, Swords had only been employed for thirteen months. Accordingly, Swords is not a proper comparator.

Plaintiff also claims that Retail Supervisor Chad Murdock's email to members of his division outlining an incentive program for retail sales representatives who provided referrals to Swords is evidence that she was treated more favorably. Despite claiming Tom Geyer was the individual at Ampac who was out to get him due to his age, the only evidence presented relative to Swords' retail incentive program was that Plaintiff believed the program was initiated by Italiano and Murdock, not Geyer. (Doc. 14 at 105-106). Additionally, Plaintiff never saw the email initiating the incentive program and did not know why Swords was assisted. (*Id.*) Murdock explains;

> Q. And why were they [retail sales employees] asked to help Tracy Swords and not anybody else in the security segment?
>
> A. Well, at the time, if I recall correctly, they had changed the responsibilities of the customers and the new businesses they were targeting. And Tracy's job was to target Retail. So she was responsible for that space. I don't believe anybody else was, so it would have been only been her job to close those types of customers.

15

(Doc. 22 at 42-43). It is undisputed that Swords was given assistance with leads from the retail division because she was the only security sales person who also served retail customers. (*Id.*) Accordingly, Swords is not similarly situated.

### c. Card

Finally, Plaintiff claims that Health Card is a proper comparator. Plaintiff argues that Defendant planned his termination as early as 2009. However, when the security sales division needed to release a sales representative in 2010, Plaintiff was not selected for termination. (Doc. 14 at 78). Instead, Health Card, age 27, the youngest member of the team, was terminated. (*Id.*) Plaintiff explained that Card was selected because she was the youngest and most inexperienced member of the team: "…I think [Geyer] just said, we need to cut somebody out of here. And Sep, you make – you cut the baby." (*Id.* at 78). The fact that Card was terminated in 2010, at a time that Ampac was allegedly attempting to terminate Plaintiff's employment, further disproves that age was a factor in Plaintiff's termination.

### 2. *Replacement*

Plaintiff alleges that he was replaced by Brian Calabro who is 27 years younger than he. (Doc. 23, Ex. A at Rog 16). However, Calabro was hired *five* months after Plaintiff's termination, and only after Steve Bansbach resigned his position to take another job. (Doc. 14 at 164). Therefore, it is impossible for Plaintiff to claim that he was replaced by Calabro.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that he has failed to establish that there were non-protected employees who engaged in the same or similar conduct such that the Court could analyze the treatment of those employees against the treatment of Plaintiff for purposes of age discrimination. Accordingly, Plaintiff has failed to satisfy the last prong of the *McDonnell Douglas prima facie* case.

### B. Legitimate Non-Discriminatory reason

Assuming, *arguendo*, that Plaintiff established a *prima facie* case of age discrimination, the burden shifts to the Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 377 (6th Cir. 2002).

Defendant terminated Plaintiff because he failed to meet sales objectives. (Doc. 18 at 23-24, 34; Doc. 17 at 77). Specifically, Plaintiff repeatedly failed to meet new account sales goals despite receiving at least three performance related warnings in the last year of his employment alone. (Doc. 14 at 119-120, 122). Plaintiff was given numerous opportunities to focus on new business generation pursuant to Italiano's instructions, but was unwilling to change his approach, and refused to leave the office and see new prospective clients. (Doc. 17 at 104-105; Doc. 18 at 66, 70-71). Plaintiff was terminated as a result of his failure to generate new business. (Doc. 18 at 62-63).

17

### C. Pretext

If the defendant articulates a legitimate, non-discriminatory reason for its actions, the burden then shifts back to the plaintiff to show that the defendant's articulated reason was false and that unlawful discrimination was the real reason. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). To prove pretext, plaintiff must show by a preponderance of the evidence either that the proffered reason: (1) had no basis in fact; (2) did not actually motivate the employer's action; or (3) was insufficient to motivate the action. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Ultimately, "a reason cannot…be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). A plaintiff cannot show pretext by simply disputing the allegations or questioning the reason given. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). Instead, a plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* at 494.

Plaintiff argues that his annual sales records demonstrate that Defendant's reason – Plaintiff's alleged consistently poor sales performance – has no basis in fact. At the time Defendant began subjecting Plaintiff to unwarranted disciplinary action in August 2010, Plaintiff was, and had been, consistently one of the top salesmen in the division. (Doc. 17 at 87, 73-88, Ex. 4). In fact, Plaintiff's annual sales for 2010 constituted an increase of over $400,000 from 2009 and exceeded Trass's 2010 annual sales totals by

18

roughly $195,000. (*Id.*) In 2011, Plaintiff was again a top performer in the security sales division, even though Ampac had removed several of his accounts, including PolyAir, and reassigned them to other, significantly younger sales representatives. (Doc. 14 at 100, 174-180, 191-192; Doc. 17, Ex. 4). However, as explained *supra*, Plaintiff was not terminated because of his annual sales totals -- he was terminated because he was not generating new business.

Plaintiff also argues that he was subject to unsustainable and unattainable sales goals designed as hazards or road blocks that he could not overcome. (Doc. 14 at 226-227). Again, as explained *supra*, Plaintiff was not similarly situated to Trass or the other sales representatives.

Plaintiff also tries to show pretext by arguing that Geyer did not like old people working in the plant and that he was out to "get" Plaintiff. Plaintiff testified to a single comment allegedly made by Geyer in 2009 or 2010 and allegedly overheard by Human Resources Manager Randy Adams, who denied knowledge of any such statement. (Doc. 24 at 17-18). Even if the Court assumes that Adams told Plaintiff that he overheard Geyer making a comment to a third person, the reference to removing old people from Ampac's plant does not prove pretext. *See, e.g., Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) ("isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination."). Plaintiff also alleges that there is evidence that Tim McClamrock was terminated in part because of Geyer's dislike for old people. (Doc. 14 at 43-44). Plaintiff's evidence consists of his

own self-serving statement that in 2008, McClamrock informed him that he had been terminated by Geyer due to a personality conflict and his age.  (*Id*. at 42-43).  This evidence is insufficient to prove pretext.  Plaintiff's reliance on self-serving, conclusory statements without any actual support in the record cannot defeat Defendant's motion or summary judgment.  *Evans v. Jay Instrument & Specialty Co.*, 889 F.Supp. 302, 310 (S.D. Ohio 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (finding "self-serving and conclusory allegations are insufficient to withstand a motion for summary judgment")).

Therefore, Plaintiff's claims fail as a matter of law.

## V. CONCLUSION

Accordingly, for these reasons, Defendant's motion for summary judgment (Doc. 19) is **GRANTED**.  The Clerk shall enter judgment accordingly, and this case shall be **CLOSED** in this Court.

**IT IS SO ORDERED**.

Date:  4/15/15                                                                                  *s/ Timothy S. Black*
                                                                                                             Timothy S. Black
                                                                                                             United States District Judge